# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| **Chris Mamazza and Marisa Mamazza,** ) | **Case No.:** |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **NEWREZ LLC d/b/a** ) | |
| **SHELLPOINT** ) | |
| **MORTGAGE SERVICING;** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>COMPLAINT AND DEMAND FOR A JURY TRIAL</u>

### INTRODUCTION

1. Plaintiffs Chris Mamazza and Marisa Mamazza ("Plaintiffs"), by and through Plaintiffs' attorneys, brings this action to challenge the actions of NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Defendant") regarding Defendant's unauthorized and unlawful credit inquiries and Defendant's unlawful debt collection efforts.

2. Plaintiffs make these allegations on information and belief, except for those allegations that pertain to Plaintiffs, or to Plaintiffs' counsel, which Plaintiffs allege on personal knowledge.

3. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

4.  Unless otherwise stated, all the conduct engaged in by Defendant took place in Florida.

5.  Defendant committed each of the violations stated herein knowingly, willfully, and intentionally, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

6.  Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant.

7.  Through this Complaint, Plaintiffs do not allege that any state court judgment was entered against anyone in error, and Plaintiffs do not seek to reverse or modify any judgment of any state court.

### *The Fair Credit Reporting Act*

8.  The United States Congress has found abundant evidence that the banking system is dependent upon fair and accurate credit reporting.

9.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

10.   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

11.   There is a need to ensure that entities regulated by the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") exercise their grave responsibilities imparted by the FCRA with fairness, impartiality, and a respect for the consumer's right to privacy.

12.   Congress wrote the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, to require that consumer reporting agencies, furnishers, and other persons adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.

### *The Fair Debt Collection Practices Act*

13.   The United States Congress has also found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

14. Congress wrote the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (hereinafter "FDCPA"), to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

15. The purpose of the FDCPA is to eliminate abusive debt collection Practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses.

16. If a violation occurs, "the FDCPA is a strict liability statute that makes debt collectors liable for violations that are not knowing or intentional." *Donahue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010).

17. Even a single violation of the FDCPA is sufficient to support liability. *Taylor v. Perrin, Landry, deLaunay, & Durand*, 103 F.3d 1232, 1238 (5th Cir. 1997).

18. All alleged FDCPA violations herein are material violations of the FDCPA as these violations would limit the ability of a hypothetical least sophisticated consumer and/or unsophisticated consumer to make an intelligent choice as to the alleged debt and actions that should be taken as to the alleged debt.

## *The Florida Consumer Collection Practices Act*

19.    The Florida Consumer Collection Practices Act, Fla. Stat. § 559.72 *et seq.* (hereinafter "FCCPA"), was adopted by Florida to reinforce consumer rights established by the FDCPA for individuals who allegedly owed debts to others.

20.    The FCCPA does not limit or restrict the applicability of the FDCPA, but instead adds additional consumer protections that may otherwise not be covered by the FDCPA.

21.    In the event of any inconsistency between the FDCPA and FCCPA, the provision which is more protective of the consumer shall prevail.

22.    The FCCPA applies to all persons attempting to collect debts from consumers, including original creditors and debt collectors.

23.    The FCCPA prohibits the collection of amounts that are not agreed to by contract or expressly provided for by law.

### JURISDICTION AND VENUE

24.    Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1331.

25.    This Court has federal question jurisdiction because this case arises out of Defendant's violations of federal law—the FCRA and FDCPA.

26.    Jurisdiction arises for Plaintiffs' supplemental state claims pursuant to the FCCPA under 28 U.S.C. § 1367.

27. Venue is proper pursuant to 28 U.S.C. § 1391 as the events and transactions at issue in this case occurred in this judicial district.

28. Defendant is subject to the Court's personal jurisdiction, as Defendant conducts business within this judicial district.

29. Plaintiffs are informed and believe and thereon allege that all acts of Defendant's corporate employees as hereinafter alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

30. Plaintiffs are informed and believe and, on that basis, allege that at all times mentioned herein Defendant was the principal, agent (actual or ostensible), or employee and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which Defendant is liable to Plaintiffs for the relief prayed for herein.

## PARTIES

31. Plaintiffs are natural persons who reside in Sarasota, Florida.

32. Plaintiffs are each a "consumer" as that term is defined by 15 U.S.C. § 1692a.

33. In addition, each Plaintiff is a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

34. Plaintiffs are each "any person" as that term is used in the preface contained in 15 U.S.C. § 1692d.

35. Plaintiffs are each a "consumer" as that term is defined by Fla. Stat. § 559.55(8).

36. Plaintiffs are each a natural person whose consumer report was affected by an unauthorized inquiry.

37. Defendant is a "person" as defined by 15 U.S.C. § 1681a(b).

38. Defendant is a "debt collector", as that term is defined by 15 U.S.C. § 1692a(6).

39. Defendant is a "debt collector" as that term is defined by Fla. Stat. § 559.55(7).

40. Defendant attempted to collect a debt that it acquired after that debt had gone into default.

41. Defendant can be served at its registered agent: The Corporation Company, 40600 Ann Arbor Road E., Suite 201, Plymouth, MI 48170.

## FACTUAL ALLEGATIONS

42. At all times relevant, Defendant conducted business in the State of Florida.

43. Plaintiffs are informed and believe, and thereon allege, that Defendant acquired Plaintiffs' credit information through an unauthorized inquiry of each Plaintiff's "consumer report" as defined by 15 U.S.C. §1681a(d)(1).

44. Consumer report and credit report will be used interchangeably herein to refer to the same item, as defined by 15 U.S.C. §1681a(d)(1).

*Plaintiffs' Bankruptcy*

45.    Sometime before August 2019, Plaintiffs acquired a second mortgage on their home in Madison County, Indiana (the "Second Mortgage").

46.    On or about September 11, 2019, Plaintiffs filed for Chapter 7 bankruptcy in the Southern District of Indiana and were assigned case number 19-06754-RLM-7 (the "Bankruptcy").

47.    At the onset of the Bankruptcy, the Second Mortgage was serviced by Ditech.

48.    The Second Mortgage was identified in Plaintiffs' Bankruptcy petition.

49.    Ditech received notice of the Bankruptcy petition.

50.    In the Bankruptcy, Plaintiffs surrendered the property associated with the Second Mortgage.

51.    On or about December 10, 2019, Plaintiffs received an order for discharge in the Bankruptcy.

52.    The Second Mortgage was discharged in the Bankruptcy.

53.    Ditech received notice of the discharge in the Bankruptcy.

54.    Upon receiving discharge in the Bankruptcy, Plaintiffs no longer had an account or debt owed on the Second Mortgage.

55.    After December 10, 2019, Plaintiffs no longer had a business relationship with any entity on the Second Mortgage.

56. Thereafter, the holder of a first mortgage on the subject property in Madison County, Indiana foreclosed upon the property and received a judgment in February 2020.

57. The holder of the first mortgage on the subject property then executed a sheriff's sale in February 2021 for an amount less than the judgment awarded to the holder of the first mortgage.

58. Upon information and belief, the subject property in Madison County, Indiana is presently owned by people other than Plaintiffs.

59. After the surrender of the property, the discharge in the Bankruptcy, and the sale of the property, Plaintiffs no longer had any *in rem* or *in personam* interest in the property that was associated with the Second Mortgage.

### *Defendant's Debt Collection Efforts*

60. After acquiring the Second Mortgage, and well after the bankruptcy discharge, foreclosure by the holder of the first mortgage of the subject property and the sheriff's sale, Defendant attempted to collect the debt associated with the Second Mortgage.

61. By October 2021, Plaintiffs had been out of the property associated with the Second Mortgage for over two years, hadn't owed any money on the Second Mortgage by virtue of the discharge in the Bankruptcy since December 2019,

and had absolutely no interest in the property associated with the Second mortgage after the sheriff's sale in February 2021.

62. However, on a letter dated October 28, 2021 (the "October 2021 Letter"), Defendant stated that Plaintiffs were "behind on [their] mortgage payments(s)" and that "[a]s of the date of this letter, the total amount due is $9,635.02."

63. The October 2021 Letter was sent to Plaintiffs' present home in Sarasota, Florida.

64. The October 2021 Letter threatened that Defendant has "a right to invoke foreclosure based on the terms of your mortgage contract."

65. In November 2021 Plaintiffs called Defendant to inquire as to why Defendant had made hard pulls of their credit reports and explained to Defendant that the Property had been surrendered in the Bankruptcy and that Plaintiffs had received a discharge.

66. Plaintiffs received another letter dated December 13, 2021 (the "December 2021 Letter") that again stated that Plaintiffs were behind on their mortgage payments and now owed $10,180.20.

67. The December 2021 Letter was again sent to Plaintiffs' present home in Sarasota, Florida.

68. The December 2021 Letter again threatened that Defendant had a right to invoke foreclosure against Plaintiffs.

69.  Plaintiffs received another letter at their Sarasota, Florida home dated January 27, 2022 (the "January 2022 Letter") that again stated Plaintiffs were behind on their mortgage payments, that Plaintiffs now owed $10,567.79, and again threatened to invoke foreclosure.

70.  Plaintiffs received yet another letter at their Sarasota, Florida home dated March 14, 2022 (the "March 2022 Letter") that made the same threats as the October 2021 Letter, December 2021 Letter, and January 2022 Letter, but this time increased the total amount due to $12,557.97.

71.  Once more, Plaintiffs received a letter at their Sarasota, Florida home dated April 28, 2022 (the "April 2022 Letter") that again made all of the same threats as the October 2021 Letter, December 2021 Letter, January 2022 Letter, and March 2022 Letter, but now increased the total amount due to $12,830.56.

72.  In 2021 and 2022, Defendant sent Plaintiffs several other letters, including a notice of default and demand for payment to cure default, account statements demanding payments for the total claim about owed for the Second Mortgage, as well as separate letters to each Plaintiff in May 2022 that provided a disclosure that Defendant was aware of the Bankruptcy and was merely sending the notice for "informational" purposes but demanded $28,891.91 from each Plaintiff that Plaintiffs were not obligated to make, but could "pay Shellpoint at [each respective Plaintiff's] discretion."

73.   In addition to the several letters Defendant sent to Plaintiffs' Sarasota, Florida home, Defendant also made dozens of calls in 2022 to Plaintiffs in an attempt to collect the debt associated with the Second Mortgage.

74.   On several of these calls, Plaintiffs repeatedly explained they had surrendered the Property in Bankruptcy and had received a discharge and that Plaintiffs owed no debt to Defendant on the Second Mortgage.

75.   On several of these calls Defendant told Plaintiffs that Defendant would review the matter and respond to Plaintiffs.

76.   Despite Defendant's assurances that it would look review the matter, Defendant failed to do so and instead made additional calls in an attempt to collect the debt associated with the Second Mortgage without ever responding to Plaintiffs' statements concerning the surrender of the Property and Bankruptcy discharge.

77.   Defendant continued to attempt to collect the debt associated with the Second Mortgage years after Plaintiffs surrendered the property, years after it was discharged in the Bankruptcy, and well after a sheriff's sale that resulted in people other than Plaintiffs actually living in and owning the house.

### *Defendant's Impermissible Pulls*

78.   Defendant's pattern of harassment of Plaintiffs was not isolated to debt collection letters and calls.

79.   Sometime before January 14, 2022, Plaintiffs noticed that Defendant had made hard pulls on their credit reports.

80.   Specifically, Defendant made hard pulls of each of Plaintiff Marisa Mamazza's Equifax, Experian, and TransUnion credit reports on October 19, 2020 and November 2, 2021.

81.   Defendant also made a hard pull of each of Plaintiff Christopher Mamazza's Equifax, Experian, and TransUnion credit reports on November 2, 2021.

82.   Plaintiffs were made aware of the hard pulls when they received credit alerts notifying them of a drop in their credit scores.

83.   Plaintiffs did not authorize Defendant to make hard inquiries into their respective credit reports.

84.   Plaintiffs had not lived in the property associated with the Second Mortgage since August 2019.

85.   Plaintiffs' debt on the Second Mortgage was discharged in Bankruptcy in December 2019.

86.   Plaintiffs did not have any business relationship with Defendant after December 2019.

87.   Defendant did not have a permissible purpose for pulling Plaintiffs' credit reports.

88.   After realizing Defendant made unauthorized hard pulls of their credit reports, Plaintiffs called Defendant in November 2021 to inquire as to why Defendant had pulled Plaintiffs' credit reports and explaining to Defendant that Plaintiffs had surrendered the property associated with the Second Mortgage and that the debt had been discharged in Bankruptcy years ago, and that Plaintiffs did not owe any debt to Defendant.

89.   Plaintiffs also wrote a letter to Defendant, dated January 14, 2022, requesting that the hard pulls be removed from their credit reports.

90.   Defendant received Plaintiffs' letter requesting that the hard pulls be removed from their credit reports.

91.   As of June 2022, Defendant had still not removed the hard pulls from Plaintiffs' credit reports.

### *Credit Scoring*

92.   The Fair Isaac Corporation credit risk scoring system, also known as "FICO", is a ubiquitous credit scoring system and utilizes data reported by credit reporting agencies. *See* https://www.myfico.com/credit-education/credit-scores/ .

93.   Defendant's hard inquiries caused Plaintiffs to suffer from reduced FICO credit scores.

94.  The Fair Isaac Corporation uses the data in consumer reports to calculate credit scores that it assigns to consumers.

95.  The term "credit score" is a numerical value or a categorization used to predict the likelihood of certain credit behaviors, including default. *See* http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf.

96.  FICO scores are calculated from credit data in a consumer's credit report that are arranged in five main categories. Those categories are identified and weighted as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; *new credit/recent inquiries accounts for 10% of a consumer's FICO score*; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score/.

97.  A consumer's credit score impacts that consumer's cost of credit (e.g., interest rates, fees, etc.), availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extend financing periods, lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines.

98.    Inaccurate or incorrect credit reporting often results in a lower FICO (and other credit scoring model) scores, thus creating higher costs of credit for the consumer, diminished opportunities, and less purchasing power.

99.    Here, causing hard pulls to appear on Plaintiffs' credit reports has resulted in the illegitimate suppression of Plaintiff's FICO credit score and/or other credit rating model scores.

100.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score; *i.e.*, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's ability to receive credit, the type of credit, or rates of that credit that a consumer may receive.

101.    Consistent with the FTC Study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/.

### *Violations of the FCRA and Plaintiffs' Damages*

102.    As a result of Defendant's hard pulls of Plaintiffs' credit reports, Defendant retrieved and received Plaintiffs' confidential financial information without Plaintiffs' permission or authorization.

103.  15 U.S.C. § 1681b(f) provides, in part, that "[a] person shall not obtain a consumer report for any purpose unless—(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section[.]"

104.  Defendant's consumer report inquiries and subsequent obtainment of Plaintiff's credit reports, without Plaintiffs' consent, falls outside the scope of any permissible use or access included in 15 U.S.C. § 1681b.

105.  Therefore, Defendant violated 15 U.S.C. § 1681b by obtaining Plaintiffs' credit reports without a permissible purpose provided for by 15 U.S.C. § 1681b.

106.  Defendant's actions were willful under 15 U.S.C. §§ 1681n because Defendant was aware of the FCRA's prohibitions on impermissibly pulling consumers' credit reports. *See Doe v. Sentech Employment Services, Inc.*, E.D. Mich. May 16, 2016) (citing *Singleton v. Domino's Pizza, LLC*, 2012 WL 245965, *4 (D. Md. Jan. 25, 2012) ("[A]ssertions that a defendant is aware of the FCRA, but failed to comply with its requirements, are sufficient to support an allegation of willfulness and to avoid dismissal.").

107.  Plaintiffs suffered an invasion of a legally protected interest Defendant accessed Plaintiff's highly confidential personal information their credit reports at a time when Defendant had no right to do so.

108. Defendant's hard inquiries constitute an invasion of Plaintiffs' right to privacy.

109. Plaintiffs have a common law right to keep their personal credit information private. *E.g.*, Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 1155, 193 (1890).

110. By obtaining Plaintiffs' credit reports, Defendant intruded upon Plaintiffs' seclusion.

111. According to the Restatement (Second) of Torts § 652B, "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

112. The common law tort of intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Id.* Rather, "[i]t consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man."

113. At common law, "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined." *Id.*

114.  The FCRA, through 15 U.S.C. § 1681b, protects consumers like Plaintiffs from the type of behavior Defendant engaged in as described in this Complaint.

115.  The common law tort of intrusion upon seclusion is preempted by the FCRA, and the FCRA expressly provides that Congress made the following finding: "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's right to privacy." 15 U.S.C. §1681a(4).

116.  Plaintiffs were impacted personally because when they discovered the actions of Defendant as described above (pulling their credit reports without any authorization), Plaintiffs' privacy was invaded, and their personal and private information was disclosed to Defendant.

117.  Defendant had no right to Plaintiffs' private financial information.

118.  Plaintiffs each suffered significant mental and emotional distress because of Defendant's invasion of Plaintiffs' privacy.

119.  Over the course of many months, Plaintiffs have spent dozens of frustrating and futile hours trying to resolve Defendant's credit pulls.

120.  On many occasions Defendants' conduct has left Plaintiff Marisa Mamazza in tears, and that has caused her husband, Plaintiff Christopher Mamazza, feeling powerless to comfort his spouse.

121. Plaintiffs have medical conditions that have been aggravated by Defendant's conduct.

122. Plaintiffs have spent many sleepless nights worrying about Defendant's intrusion into their personal financial data in their credit reports based on Defendant's efforts to collect a non-existent debt.

123. Defendant's conduct has left Plaintiffs irritable and distracted and has impacted their ability to function at work.

124. The injury suffered by Plaintiffs is concrete because Defendant's violation of 15 U.S.C. § 1681b caused Plaintiffs to suffer from significant mental and emotional distress as well as an invasion of Plaintiff's privacy.

125. In enacting 15 U.S.C. § 1681b, Congress specifically sought to protect consumers from invasions of privacy and created restrictions on access to consumers' sensitive financial information in their credit reports.

126. Further, Defendant's increased the risk that Plaintiffs will be injured if there is a data breach of Defendant's computer systems as Defendant now possesses highly sensitive information about Plaintiffs.

127. Additionally, as a result of several hard pulls appearing on their credit reports, Defendant caused Plaintiffs' credit score to decrease, thereby harming Plaintiffs' credit reputation and negatively impacting their creditworthiness.

128. In addition, to date, despite communicating with Defendant as to the unauthorized hard pulls on their credit reports, as of September 2022, the hard inquiries remain on Plaintiffs' credit reports.

129. As a result, Plaintiffs have avoided seeking credit for fear of credit denials.

130. Plaintiff Christopher Mamazza has been denied a credit card on three separate occasions.

131. In addition, Plaintiffs' credit reports have been accessed several times by third parties conducting account review inquiries and/or promotional inquiries while the hard pulls were present on Plaintiffs' credit reports; thus, Defendant further defamed Plaintiffs by causing an inaccurate picture of their credit requests that was subsequently published to third parties.

132. As such, Plaintiffs are entitled to the remedies available under 15 U.S.C. §1681n and 15 U.S.C. § 1681o.

### *Violations of the FDCPA and FCCPA and Plaintiffs' Damages*

133. As a result of Defendant's debt collection efforts upon a debt that Plaintiffs did not owe, Defendant violated the FDCPA.

134. Defendant also violated the FCCPA through its collection efforts upon Plaintiffs.

135. Plaintiffs moved out of the property associated with the Second Mortgage in August 2019 and surrendered it in their bankruptcy thereafter.

136. Plaintiffs received a discharge of the Second Mortgage in their bankruptcy in December 2019.

137. Plaintiffs did not owe a debt to Defendant after December 2019.

138. The property associated with the Second Mortgage was foreclosed upon in February 2020 and sold at a Sheriff's sale in February 2021.

139. By the time the debt collection efforts by Defendant discussed within this Complaint occurred, Plaintiffs had no liability on a loan associated with the Second Mortgage nor did they have any ownership interest in the property in Madison County, Indiana associated with the Second Mortgage.

140. Despite this, Defendant demanded thousands of dollars from Plaintiffs for the Second Mortgage and sent letters to Plaintiffs' home in Sarasota, Florida that made threats of foreclosure.

141. Any reasonable inquiry by Defendant would have revealed that Plaintiffs owed nothing to Defendant and Defendant could not legally compel any money out of Plaintiffs.

142. Defendant either knew or should have known that it had no right to collect a debt from Plaintiffs.

143. Through Defendant's letters and calls to Plaintiffs from October 2021 onward, Defendant attempted to collect a debt from Plaintiffs that they did not owe, therefore Defendant used false, deceptive, or misleading representation(s) or

means in connection with the collection of a debt, in violation of 15 U.S.C. §§ 1692e and 1692e(10).

144. Through Defendant's debt collection letters and calls to Plaintiffs from October 2021 onward, Defendant committed false representation(s) of the character, amount, or legal status of a debt, in violation of 15 U.S.C. § 1692e(2)(A).

145. Through Defendant's letters and calls to Plaintiffs from October 2021 onward, Defendant attempted to collect a debt from Plaintiffs that they did not owe, therefore Defendant used an unfair or unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. § 1692f.

146. Through Defendant's letters and calls to Plaintiffs from October 2021 onward, Defendant attempted to collect a debt from Plaintiffs that they did not owe, therefore Defendant sought to collect an amount (including any interest, fee, charge, or other expense incidental to the principal obligation) that was not permitted by law, in violation of 15 U.S.C. § 1692f(1).

147. Through Defendant's repeated debt collection letters and calls to Plaintiffs from October 2021 onward, coupled with Defendant's intrusive hard pull of Plaintiffs' credit reports—all for a debt that Plaintiffs did not owe—Defendant engaged in conduct, the natural consequence of which was to harass, oppress,

or abuse Plaintiffs in connection with the collection of a debt, in violation of 15 U.S.C. § 1692d.

148.   Through Defendant's debt collection letters and calls to Plaintiffs, Defendant attempted to collect a debt not owed by Plaintiffs and threatened to foreclose upon Plaintiffs, therefore Defendant claimed, attempted, or threatened to enforce a debt when Defendant knew that the debt was not legitimate, or asserted some other legal right when Defendant knew the right does not exist, in violation of Fla. Stat. § 559.72(9).

149.   Plaintiffs were confused as to whether Defendant could legally compel any money out of them.

150.   Plaintiffs further experienced frustration and emotional distress over the fact that Defendant continued to attempt to collect thousands of dollars from Plaintiffs and threatened foreclosure against them.

151.   Plaintiffs have been renting a home for their large family and have been working to build credit to purchase a home but worry that Defendant's claim to a debt associated with the Second Mortgage will prevent creditors from making a loan to Plaintiffs.

152.   Over the course of many months, Plaintiffs have spent dozens of frustrating and futile hours trying to resolve Defendant's demands for payment on a non-existent debt.

153. Defendant's debt collection efforts have left Plaintiff Marisa Mamazza in tears, and that has caused her husband, Plaintiff Christopher Mamazza, feeling powerless to comfort his spouse.

154. Plaintiffs have medical conditions that have been aggravated by Defendant's debt collection efforts.

155. Plaintiffs have spent many sleepless nights worrying about Defendant's debt collection threats over the Second Mortgage.

156. Plaintiffs further experienced an intrusion upon their seclusion as a result of Defendant's repeated telephone calls and debt collection letters sent to Plaintiffs' home in Sarasota, Florida.

157. Plaintiffs did not owe any debt to Defendant and every call and letter they received from Defendant was an unwanted invasion into their peace and solitude.

## FIRST CAUSE OF ACTION
## THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681 *et seq.*

158. Plaintiffs repeat, re-allege, and incorporate by reference all above paragraphs.

159. The foregoing acts and omissions constitute numerous and multiple violations of the FCRA.

160. As a result of each and every negligent violation of the FCRA, Plaintiffs are entitled to their respective actual damages, pursuant to 15 U.S.C.

§1681o(a)(1); and costs together with reasonable attorney's fees, pursuant to 15 U.S.C. § 1681o(a)(2), from Defendant.

161. As a result of each and every willful violation of the FCRA, Plaintiffs are entitled to their respective actual damages or damages of not less than $100.00 and not more than $1,000.00 each, pursuant to 15 U.S.C. §1681n(a)(1)(A); punitive damages for each Plaintiff as the court may allow, pursuant to 15 U.S.C. §1681n(a)(2); and costs together with reasonable attorney's fees, pursuant to 15 U.S.C. §1681n(a)(3) from Defendant.

## SECOND CAUSE OF ACTION
## THE FAIR DEBT COLLECTION PRACTICES ACT
## 15 U.S.C. § 1692 *et seq.*

162. Plaintiffs repeat, re-allege, and incorporate by reference all above paragraphs as if fully set forth herein.

163. The foregoing acts and omissions constitute numerous and multiple violations of the FDCPA by Defendant, including, but not limited to: 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), 1692f, and 1692f(1).

164. As a result of each violation of the FDCPA by Defendant, Plaintiffs are each entitled to their respective actual damages from Defendant pursuant to 15 U.S.C. § 1692k(a)(1), statutory damages from Defendant of $1,000 each, pursuant to 15 U.S.C. 1692k(a)(2), and costs together with reasonable attorneys' fees as provided by 15 U.S.C. § 1692k(a)(3).

### THIRD CAUSE OF ACTION
### THE FLORIDA CONSUMER COLLECTION PRACTICES ACT
### FLA. STAT. § 559.55 *et seq.*

165. Plaintiffs repeat, re-allege, and incorporate by reference all above paragraphs as if fully set forth herein.

166. The foregoing acts and omissions constitute violations of the FCCPA by Defendant, including, but not limited to: Fla. Stat. § 559.72(9).

167. As a result of each violation of the FCCPA by Defendant, Plaintiffs are each entitled to their respective actual damages from Defendant, additional statutory damages of up to $1,000.00 each from Defendant, punitive damages from Defendant, together with costs and reasonable attorneys' fees incurred by Plaintiffs, pursuant to Fla. Stat. § 559.77(2).

### REQUEST FOR JURY TRIAL

168. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the Court grant Plaintiffs the following relief against Defendant:

1. A declaratory judgment that Defendant's actions as discussed herein are unlawful and an invasion of privacy;

2. Each Plaintiff's respective actual damages for violations of the FCRA;

3.    Each Plaintiff's respective actual damages for violations of the FDCPA;

4.    Each Plaintiff's respective actual damages for violations of the FCCPA;

5.    Statutory damages of not less than $100.00 and not more than $1,000.00 to each Plaintiff, pursuant to 15 U.S.C. § 1681n(a)(1), against Defendant;

6.    Statutory damages of $1,000.00 to each Plaintiff, pursuant to 15 U.S.C. § 1692k(a)(2) for violations of the FDCPA;

7.    Statutory damages of $1,000.00 to each Plaintiff, pursuant to Fla. Sta. § 559.77(2) for violations of the FCCPA;

8.    Punitive damages for each Plaintiff against Defendant, pursuant to 15 U.S.C. §1681n(a)(2) for violations of the FCRA;

9.    Punitive damages for each Plaintiff against Defendant, pursuant to Fla. Stat. § 559.77(2) for violations of the FCCPA;

10.   An award of costs of litigation together with reasonable attorney's fees, pursuant to 15 U.S.C. §§ 1681o(a)(2) and/or 1681n(a)(3), against Defendant for violations of the FCRA;

11.   An award of costs of litigation together with reasonable attorneys' fees, pursuant to 15 U.S.C. § 1692k(a)(3) against Defendant for violations of the FDCPA;

12.     An award of costs of litigation together with reasonable attorneys' fees, pursuant to Fla. Stat. § 559.77(2); and

13.     Any other relief the Court may deem just and proper.


Dated: <u>October 5, 2022</u>          Respectfully submitted,


                              By: <u>/s/ Mike Kazerouni</u>
                              Mohammad (Mike) Kazerouni, Esq.
                              Fla. Bar No. 1034549
                              **Kazeoruni Law Group, APC**
                              245 Fischer Ave., Unit D1
                              Costa Mesa, CA 92626
                              Telephone: 800-400-6808
                              Fax: 800-520-5523
                              Email: mike@kazlg.com
                              *Trial Counsel for Plaintiffs*